**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CAROLE L. FISHER

                              Plaintiff,

            - v -                                    Civ. No. 5:14-CV-1498
                                                         (MAD/DJS)

CAROLYN W. COLVIN, *Acting Commissioner of Social*
*Security*,

                              Defendant.

**APPEARANCES:**                          **OF COUNSEL:**

STANLEY LAW OFFICES, LLP              JAYA A. SHURTLIFF, ESQ.
Attorneys for Plaintiff
215 Burnet Avenue
Syracuse, NY 13203

SOCIAL SECURITY ADMINISTRATION      DAVID L. BROWN, ESQ.
Attorney for Defendant
Office of Regional General Counsel
Region II
26 Federal Plaza – Room 3904
New York, New York 10278

**DANIEL J. STEWART**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

In this action, Plaintiff Carole L. Fisher moves, pursuant to 42 U.S.C. § 405(g), for

review of a decision by the Commissioner of Social Security denying her application for

Disability Insurance Benefits ("DIB").[1]  Based upon the following discussion, this Court

---

[1] This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed when appealing a denial of Social Security benefits.  Both parties have filed Briefs, though oral argument was not heard. Dkt. Nos. 10 & 16.

recommends that the Commissioner's decision denying disability benefits be affirmed.

# I. BACKGROUND

Carole L. Fisher was born on January 25, 1962, and was forty-seven years old at the time of her amended alleged onset disability date of November 1, 2009.[2] Dkt. No. 9, Admin. Transcript [hereinafter "Tr."], at pp. 50, 177 & 204. In seeking DIB, Ms. Fisher alleges disability due to several conditions, including, but not limited to, low back pain, migraine headaches, depression, alcoholism, arthritis, a learning disability due to a traumatic brain injury, and a lack of concentration and memory/motor skills. *Id*. at p. 208.

Fisher filed for disability benefits on December 27, 2011, alleging an onset disability date of July 4, 2004, which was later amended to November 1, 2009. *Id*. at pp. 22, 49, 90, & 204. Her claim was denied on April 27, 2012, after which a hearing was held in front of Administrative Law Judge ("ALJ") Barry Ryan on May 14, 2013. *Id*. at pp. 44-81 & 90. On July 8, 2013, the ALJ issued a written decision finding that Fisher was not disabled. *Id*. at pp. 19-43. On November 25, 2014, the Appeals Council denied Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the Commissioner. *Id*. at pp. 1-5. Exhausting all of her options for review through the Social Security Administration's Tribunals, Plaintiff now brings this appeal.

---

[2] Plaintiff originally set for July 4, 2004 as the alleged onset disability date, but later amended that date during the hearing, held before the administrative law judge, to more accurately reflect the date she stopped working. Dkt. No. 9, Admin. Transcript [hereinafter "Tr."], at pp. 22 & 49.

## II.  DISCUSSION

### A.  Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and whether the correct legal standards have been applied.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325–26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, substantial evidence is "more than a mere scintilla" of evidence scattered throughout the administrative record; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *see also Williams ex. rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  "To determine on appeal whether an [Administrative Law Judge's] findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex. rel. Williams v. Bowen*, 859 F.2d at 258.

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record.  *Williams ex rel. Williams v. Bowen*, 859 F.2d at 258; 42 U.S.C. § 405(g).  However, where the weight of the evidence does not meet the requirement for

substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

## B. Determination of Disability

To be considered disabled within the meaning of the Social Security Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. *Id*. at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. § 404.1520. At Step One, the Commissioner "considers whether the claimant is currently engaged in gainful activity." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends. 20 C.F.R. § 404.1520(b). If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. *Id.* at § 404.1520(c). If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an

impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations. *Id*. at § 404.1520(d). The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience. *Berry v. Schweiker*, 675 F.2d at 467. Where the claimant has such an impairment the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity. *Id*. If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity ("RFC")[3] to perform his or her past relevant work despite the existence of severe impairments. 20 C.F.R. § 404.1520(e). If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy. *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 404.1520(f)-(g).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four). *Berry v. Schweiker*, 675 F.2d at 467. If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy. *Id*.; 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). In making this showing at Step Five, the claimant's RFC must be considered

---

[3] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 404.1545(a).

along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. § 404.1520(f)-(g); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990); *Lewis v. Comm'r of Social Security*, 2005 WL 1899399, at *3 (N.D.N.Y. Aug. 2, 2005) (citations omitted). In this final stage, it may be necessary for the hearing officer to hear testimony from a Vocational Expert. Social Security Ruling No. 83-14, *Titles II and XVI: Capability To Do Other Work–The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments*, 1983 WL 31254, at *3-4 (S.S.A. 1983); *Bapp v. Bowen*, 802 F.2d 601, 603 (2d. Cir. 1986).

### C. ALJ Ryan's Findings

Using the five-step disability evaluation, ALJ Ryan found that: 1) Fisher had worked since the amended onset disability date of November 1, 2009, but none of the work constituted substantial gainful activity; 2) she had severe medically determinable impairments, including a history of alcohol abuse, post-traumatic stress disorder, depression, and degenerative disc disease; 3) Fisher did not have an impairment or combination of impairments that meets or medically equals any impairment listed in Appendix 1, Subpart P of the Social Security Regulations Part 404; 4) she retained the RFC to perform light work and was unable to perform any past relevant work; but 5) given her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the she could perform, and therefore was not considered disabled as defined in the Social Security Act. Tr. at pp. 19-43.

## D. Plaintiff's Contentions

Plaintiff contends that the Commissioner's decision should be reversed because in rendering the RFC determination, the ALJ failed to properly weigh the medical opinions and improperly evaluated Plaintiff's credibility. Plaintiff also contends that the ALJ erred by not consulting a Vocational Expert ("VE"). Dkt. No. 10, Pl.'s Br., at pp. 8-23.

### 1. RFC and Plaintiff's Credibility

The Commissioner assesses a claimant's RFC as a basis for determining the particular types of work the claimant may be able to do despite the existence of physical and/or mental impairments. *See* 20 C.F.R. § 404.1545(a); 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c). In qualifying work in the national economy, the Regulations classify and define jobs according to their physical exertion requirements as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the plaintiff's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id*. at § 404.1545(a); *Andrews v. Astrue*, 2012 WL 3613078, at *3 (N.D.N.Y. Aug. 21, 2012).

In determining Plaintiff's RFC, ALJ Ryan considered numerous medical records and opinions, including 1) Medical Source Statements completed in February 2013 from Steven Goldstein, M.D., and Louis Fuchs, M.D., both impartial medical experts who did not examine Plaintiff; 2) a Loan Discharge Application based on Total and Permanent Disability completed in October 2012 by Plaintiff's treating physician, Harminder Grewal, M.D.; 3) an

Internal Medical Examination completed in April 2012 by Elke Lorensen, M.D.; 4) a Medical Source Statement completed in July 2012 by Plaintiff's primary care treatment provider, Linda Bellefeuille, RNNP; 5) a Mental RFC Assessment completed in April 2012 by T. Harding; and 6) a psychiatric evaluation completed in April 2012 by Christina Caldwell, Psy.D. *Id*. at pp. 659-69, 688-90, 704-07, 758-59, 783-801, & 838-46. He also considered the Plaintiff's disability rating rendered by the Department of Veteran's Affairs as well as Plaintiff's subjective complaints of symptoms.

Following the hearing and after reviewing the record, ALJ Ryan determined that Fisher retained the following RFC during the course of an eight-hour workday:

> [Fisher can] lift and/or carry 20 pounds on an occasional basis and 10 pounds on a frequent basis; stand and/or walk for a total of six hours; and sit for a total of six hours. . . . [C]laimant retains the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with others to the extent necessary to carry out simple tasks; and handle reasonable levels of simple, repetitive work-related stress, in that she can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require [her] to supervise or manage the work of others.

*Id*. at p. 30.

In terms of the physical aspects of this RFC, the ALJ noted that he gave some weight to the opinion provided by Dr. Grewal, Plaintiff's treating physician, great weight to the opinion rendered by consultive examiner Dr. Lorenson, and substantial weight to the opinion rendered by Dr. Goldstein. *Id*. at pp. 33-35.

With regard to the mental limitations portion of the RFC, the ALJ gave significant

weight to the mental RFC assessment of Dr. Harding, and some weight to the consultive psychiatric evaluation completed by Dr. Caldwell. *Id.* at p. 35.

As for the opinions rendered by Nurse Practitioner Bellefeuille, the ALJ noted that she is not an acceptable medical source pursuant to the Regulations and therefore could not be given controlling weight. Nevertheless, he considered her opinion and gave little weight to her physical assessments and some weight to her mental assessment. *Id.* at pp. 35 & 36.

The ALJ also considered the 80% disability rating rendered by the VA, but noted that this decision is not binding on the Commissioner of Social Security. *Id.* at p. 36. Furthermore, in rendering the above RFC, the ALJ noted that Plaintiff's subjective complaints regarding the intensity, persistence, and limiting effects of her symptoms were only partially credible. *Id.* at pp. 32-33.

### a. Treating Physician Rule and Weight Given to Opinion Evidence

Under the Regulations, a treating physician's opinion as to the nature and severity of a claimant's impairment is entitled to "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record[,]" including the opinions of other medical experts. 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).[4] Where conflicts arise in the medical evidence, resolution of

[4] A "treating physician" is the claimant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who
(continued...)

such is properly entrusted to the Commissioner.  *Veino v. Barnhart*, 312 F.3d at 588 (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)).

In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]"  *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. § 404.1527).  An ALJ may not "arbitrarily substitute his own judgment for competent medical opinion."  *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *see also Rosa v. Callahan*, 168 F.3d at 79.  The ALJ must properly state the reasons for giving less than controlling weight to a treating physician's opinion.  20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart*, 362 F.3d at 32. Failure to apply the appropriate legal standards for considering a treating physician's opinion is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of a treating physician's opinion.  *Johnson v. Bowen*, 817 F.2d 983, 985-86 (2d Cir. 1987); *see also Barnett v. Apfel*, 13 F. Supp. 2d at 316-17.

i. Physical RFC

Plaintiff's began experiencing pain in her back as early as 2004, when she suffered a low back injury while working at Walmart  *Id*. at pp. 57-58 & 664.  For her back pain, Fisher attended physical therapy sessions, saw a chiropractor, underwent nerve blocks and

---

[4](...continued)
has or had an ongoing treatment and physician-patient relationship with the individual."  *Jones v. Apfel*, 66 F. Supp. 2d 518, 524-25 (S.D.N.Y. 1999) (quoting *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)).

acupuncture, used a back brace and a TENS machine, and has taken medication regiments that include pain killers and muscle relaxers.  *Id*. at pp. 58-59.  In 2008, 2010, and 2012, Plaintiff obtained surgical consults for her back pain, but surgery was never recommended. *Id*. at pp. 534-35, 641-42, & 832.

X-rays of her lumbosacral and thoracic spine, taken on July 15, 2004, were normal. *Id*. at pp. 305-08.  In 2008, Plaintiff underwent an MRI of the lumbar spine, which revealed degenerative disc disease at L4-5 with annular tears and a diffuse annular bulge, bilateral facet hypertrophy at L4-5 with mild bilateral foraminal narrowing, mild facet hypertrophy at L5-S1, and Tarlov cysts at the S2 level.  *Id*. at pp. 378-82.  An MRI of the lumbar spine taken on June 25, 2010, was found to be unchanged.  *Id*. at pp. 373-75.

On April 13, 2012, in conjunction with her disability application, Plaintiff was seen by Dr. Lorensen for a consultive examination.  *Id*. at pp. 664-68.  X-rays taken shortly thereafter, on April 17, 2012, revealed well maintained height of vertebral bodies and intervertebral disc spaces as well as straightening.  *Id*. at p. 669.  A subsequent MRI of the lumbar spine, completed on April 14, 2012, showed multilevel degenerative disc disease, but only mild progression at the L4-5 level compared to the previous MRI.  *Id*. at pp. 671-73. EMG and nerve conduction tests completed in 2010 of the lower right extremity, and in 2012 of both lower extremities, were normal with no evidence of radiculopathy or neruopathy.  *Id*. at pp. 752-56.  X-rays conducted of Plaintiff's cervical spine in July 2012 disclosed moderate degenerative disc disease and spondylosis deformans in the lower cervical spine from C3-7, manifested by disc space narrowing, anterior osteophyte formation, and posterior osteophyte

formation. *Id*. at p. 753. Plaintiff has not sought medical treatment for her back or neck pain since August 2012. *Id*. at pp. 802-37.

During the April 2012 consultive examination with Dr. Lorenson, Plaintiff relayed that since 2004, when she injured her back, she experienced chronic pain in her lower lumbar spine with pain radiating into both her right and left hip, continuing down the left lower extremity to her knee. *Id*. at p. 664. She reported numbness and tingling in her left leg and foot, and her pain is aggravated when she sits or stands for longer then fifteen-to-twenty minutes or from doing any kind of activity or housework. *Id*. Fisher reported using a cane to assist her when ambulating outside the house because she loses her balance on account of numbness in the left leg; she stated she did not use the cane while inside her home. *Id*.

Upon physical examination, Dr. Lorenson noted that Plaintiff's gait was normal and was the same with or without the assistive device. *Id*. at pp. 665-66. Dr. Lorenson did not feel that the cane was medically necessary. *Id*. at p. 666. Dr. Lorenson also observed that Plaintiff needed no help changing for the exam nor with getting on or off the exam table, and she was able to rise from her chair without difficulty. *Id*. Plaintiff presented full flexion of her cervical spine, as well as full extension, lateral flexion bilaterally, and rotary movement bilaterally. *Id*. Lumbar spine flexion was to 80° with extension at 20°. Lateral flexion and lumbar spine rotation were full bilaterally. *Id*. at p. 667. There was decreased sensation to light touch and sharp in the right upper leg in the thigh only. And strength in the upper and lower extremities was 5/5. *Id*. Dr. Lorenson opined mild restrictions for ambulating, climbing stairs, bending, and lifting. *Id*.

*-12-*

On February 6, 2013, Dr. Goldstein, an impartial neurological consultant, reviewed the record and concluded that Plaintiff could frequently lift and carry up to ten pounds occasionally, lift up to twenty pounds frequently, could sit, stand, and walk for one hour at a time without interruption, and could sit, stand, and walk for a total of six hours in an eight-hour workday. *Id*. at pp. 794-95. He also opined that Plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, but should never climb ladders or scaffolds. *Id*. at p. 796.

Plaintiff claims that the ALJ erred by giving great weight to Dr. Lorensen's opinion, while only giving some weight to the opinion rendered by Dr. Grewal. Pl.'s Br. at pp. 11-12. Plaintiff also complains that the ALJ gave substantial weight to only portions of Dr. Goldstein's opinion, but failed to give substantial weight to the significant sit/stand limitations contained therein. *Id*.

The subject opinion of Dr. Grewal is attached to an application for a discharge of a federal loan based upon a total and permanent disability. Tr. at pp. 758-62. Therein, Dr. Grewal opined that due to various diagnoses, including low back pain, multilevel degenerative disc disease of the lumbar spine with borderline spinal stenosis at L 4-5, and lumbar radiculopathy, Fisher's ability to walk and to sit were each limited to fifteen minutes at one time; she could not lift more than ten pounds; and she was unable to do laundry, dishes, push/pull, get into a bathtub, or make her bed. *Id*. at p. 759. Dr. Grewal noted that Plaintiff could cook and do light house work, such as dusting. *Id*. He also checked a box on the form indicating that Plaintiff's medical condition did <u>not</u> prevent her "from working and

earning money indefinitely in *any* capacity in *any* field of work." *Id*. (emphasis in original).

While the ALJ found support for Grewal's determination that Ms. Fisher retained the ability to work at substantial gainful activity levels despite her physical impairments, he concluded that, based upon the objective evidence in the record, Dr. Grewal "slightly overstated" Fisher's physical limitations. *Id*. at p. 34. Based upon my review, I find that the ALJ did not commit any error in weighing Dr. Grewal's assessment as it is not supported by the objective medical evidence outlined above, and it is contradicted by other opinion evidence. Because of the conflicting medical opinions, the ALJ was within his right to resolve the conflict by only according some weight to Dr. Grewal's assessment. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2003) (noting that the opinion of a treating physician "need not be given controlling weight where they are contradicted by other substantial evidence in the record" and that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve").

With regard to Dr. Lorenson, Plaintiff argues that his opinion should not have been given great weight because it was rendered prior to the completion of certain objective tests that revealed spinal abnormalities. Plaintiff further asserts that Dr. Lorenson ignored statements regarding Plaintiff's symptoms and that his opinion was "conclusory, stale, and based on an incomplete medical record[,]" and therefore cannot be considered substantial evidence to support the ALJ's determination. Pl.'s Br. at pp. 11-12. The Court is not persuaded by Plaintiff's arguments.

First, it must be highlighted that Dr. Lorenson actually examined Plaintiff, thus

entitling his opinion to more weight than that of a non-examining medical source. 20 C.F.R. § 404.1527(c)(1). The later diagnostic reports do not change the fact that in examining Plaintiff's cervical spine, Dr. Lorenson found full flexion, extension, and full bilateral lateral flexion and rotary movement, nor that Plaintiff's lumbar spine had full bilateral lateral flexion and lumbosacral rotation. The subsequent reports only revealed mild lumbar spine and moderate cervical spine findings, and there is no indication that such reports would have altered the findings made by Dr. Lorenson based on the physical examination. And the ALJ had the benefit of all diagnostic tests when assessing the weight to accord to Dr. Lorenson's opinion. Accordingly, I do not agree that Dr. Lorenson's opinion was based upon an incomplete medical record.

Second, contrary to Plaintiff's supposition, Dr. Lorenson was not silent on Plaintiff's ability to sit, as he observed that she was no in any acute distress and had no difficulty walking on heels and toes, and could rise from her chair without difficulty. The fact that Dr. Lorenson did not opine as to any limitations with regard to Plaintiff's ability to sit for any length of time is not an indication of the incompleteness of the opinion, but rather that he, based upon his observations and examination, did not assess any such limitation. *Washington v. Astrue*, 2012 WL 6044877, at *4 (N.D.N.Y. Dec. 5, 2012) (finding that the consultive examiner's failure to assess certain limitations does not mean that he rendered an incomplete opinion where the "record was sufficiently developed and no records apparently exist to corroborate [plaintiff's] accusation of physical limitations"). Dr. Lorenson's opinion that Plaintiff had mild restrictions is consistent with other evidence of record, thus the ALJ

did not err in giving great weight to his opinion, despite his role as a consultative examiner. *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d. Cir. 1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence . . . and the report of a consultative physician my constitute such evidence"); *see also* Tr. at pp. 83-84, 86-87, 306, 368-69, 372-73, 381-82, 671-72, 794-801, & 838-46.

Lastly, Plaintiff claims that the ALJ erred in how he considered Dr. Goldstein's assessment. Pl.'s Br. at pp. 12-13. As noted above, Dr. Goldstein, an impartial medical expert in neurology, indicated that Plaintiff could frequently lift and carry up to ten pounds occasionally, lift up to twenty pounds frequently, could sit, stand, and walk for one hour at a time without interruption, and could sit, stand, and walk for a total of six hours in an eight-hour workday. Tr. at pp. 794-95. He also opined that Plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, but should never climb ladders or scaffolds. *Id*. at p. 796.

The ALJ gave substantial weight to Dr. Goldstein's assessment of Plaintiff's physical ability to perform work-related activities at the light level of exertion, but found that the postural limitations were not well supported. ALJ Ryan generally found that Plaintiff could sit, stand, and/or walk for a total of six hours in an eight-hour workday, but did not state how long she could perform each of these activities without interruption. Plaintiff contends that it was error to afford substantial weight to some of Dr. Goldstein's opinion without providing an explanation for rejecting other portions, specifically, Dr. Goldstein's opinion that Plaintiff could only sit, stand, and/or walk for one hour at a time without interruption. Pl.'s Br. at p.

12. And she contends that the ALJ committed reversible error when he failed to specify in the RFC her need to alternate between standing and sitting. *Id*. at p. 13.

I find that upon considering the entire record, the ALJ properly rejected those portions of Dr. Goldstein's opinion that were inconsistent with the record. As noted above, the ALJ afforded great weight to Dr. Lorenson's assessment, and no where in that assessment did Dr. Lorenson find that Plaintiff's ability to sit, stand, or walk was limited on a sustained basis. To the extent Dr. Goldstein's assessment, based upon his review of the record and not from his personal examination of the Plaintiff, was in conflict with a consultive examiner's assessment, the ALJ was within his discretion to resolve the conflict as he did so here, and he adequately explained his basis for doing so. Social Security Ruling No. 96-8p, *Policy Interpretation Ruling Titles II And XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at * (S.S.A. 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). Thus, I find no error with the weight accorded to Dr. Goldstein's opinion.

### ii. Mental RFC

Plaintiff suffers from alcoholism, depression, and post-traumatic stress disorder ("PTSD"). Tr. at pp. 65-66. She has received mental health treatment on and off since 1983. *Id*. at p. 499. In relevant part, from December 2009, she received mental health counseling through March 2010, at which point she was feeling better. *Id*. at pp. 523 & 547-50. In October of 2010, she resumed counseling due to an increase in depression as a result of chronic back pain and interpersonal stressors, and continued therapy through May 2011. *Id*.

at pp. 436-42, 445-46, 448-51, 454-58, 468-73, 477-83, 488-94, 496-511, & 522-23. She also received psychiatric treatment from January of 2011 through July of that year. *Id*. at pp. 428, 432, 442, 452, 473, & 483. In August 2011, Ms. Fisher indicated to her therapist that she was receiving adequate support from attending a women's group and attending psychiatry appointments, that she did not have any spare time between work and academic commitments, and did not wish to make further appointments for individual counseling. *Id*. at p. 427.

The next time Plaintiff sought mental health counseling was in November 2012, at which point she sought help for depression and dealing with psychological stressors. *Id*. at p. 821. There is no indication in the record that Plaintiff sought mental health treatment since November 2012. On December 1, 2012, the Department of Veterans Affairs determined that, because of her depression and the headaches resulting from her head injury, Ms. Fisher had a service-connected disability rating of 80%. *Id*. at pp. 55 & 191.

In connection with her DIB application, Plaintiff attended a psychiatric consultive evaluation with Christina Caldwell, Psy.D. *Id*. at pp. 659-63. During the examination, Plaintiff was reported to be cooperative and presented adequate manner of relating, socials skills, and overall presentation. *Id*. at p. 661. Her thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. Her affect was depressed; mood was dysthymic; sensorium was clear. *Id*. Dr. Caldwell assessed Plaintiff's intellectual functioning to be average with a general fund of information appropriate to experience; her insight and judgment was fair to poor. *Id*. at p. 662. Plaintiff reported to Dr.

Caldwell that she was able to cook, manage her finances, drive short distances, and take public transportation; but she needed help getting herself dressed, bathed, and groomed. *Id*. She also reported that she could not do cleaning and needed help with her laundry and grocery shopping. Fisher claimed to not have any friends, other than online friends and that she does not have a close relationship with her family members other than her daughter who "helps [her] do everything." *Id*. Dr. Caldwell opined that Fisher could follow and understand simple directions and instructions and could learn new tasks, but was limited in her ability to perform simple and complex tasks independently. She found that Fisher could maintain attention, concentration, and a regular schedule. She further determined that Fisher was limited in her ability to make appropriate decisions, relate adequately with others, and appropriately deal with stress. *Id*.

On April 26, 2012, Dr. Harding completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment based upon his review of the record. *Id*. at pp. 674-91. Therein, Dr. Harding found moderate limitations in the categories of activities of daily living, social functioning, and maintaining, concentration, persistence and pace. *Id*. at p. 684. Ultimately, Dr. Harding concluded that, while Fisher had mental impairments that could reasonably cause limitations in her mental functioning, she only presented mild-to-moderate limitations that did not preclude her from working. *Id*. at pp. 688-90.

In assessing Plaintiff's mental RFC, the ALJ found that Fisher

retains the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks; regularly attend to a routine and

maintain a schedule; relate to and interact appropriately with others to the extent necessary to carry out simple tasks; and handle reasonable levels of simple, repetitive work-related stress, in that she can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others.

*Id*. at p. 30.

In rendering this mental RFC, the ALJ gave significant weight to Dr. Harding's assessment that Plaintiff had no significant limitations with adaptation, and was not significantly limited, or only moderately limited, with regard to understanding and memory, sustained concentration and persistence, and social interaction. *Id*. at p. 35. Furthermore, the ALJ found that, consistent with the evidence of record, Dr. Harding correctly concluded that the impairments which would reasonably affect her mental functioning caused only mild to moderate limitations that did not preclude her from working. *Id*.

The ALJ also gave some weight to Dr. Caldwell's assessment that Fisher was able to follow and understand simple directions and instructions; maintain attention and concentration; maintain a regular schedule; and learn new tasks, since those determinations were supported by the record. *Id*. However he found no such support for Dr. Caldwell's determination that Plaintiff could not perform simple tasks independently; make appropriate decisions; relate adequately with others; and appropriately deal with stress. *Id*. The ALJ determined that while Dr. Caldwell's assessment placed some limitations on the type of work that Fisher could perform, there was no indication that Plaintiff could not carry out the basic mental demands required for unskilled work. *Id*. Further he stated that by restricting Plaintiff to "simple, low-stress work," he accounted for the portion of Dr. Caldwell's opinion

that found Fisher was limited in her ability to perform complex tasks and appropriately handle stress. *Id.*

Plaintiff contends that the ALJ erred when he rendered inconsistent findings whereby he gave some weight to Dr. Harding's opinion at Step Two of the disability evaluation, but determined Plaintiff's mental RFC to include mild, rather than moderate, restrictions of activities of daily living and maintaining social functioning. Plaintiff further contends that the ALJ erred when he relied upon those portions of Dr. Caldwell's opinions that supported his RFC determination, while finding no support for parts that were favorable to a disability determination. And, Plaintiff asserts that the ALJ erred when he failed to consider the VA disability rating and when he improperly relied upon Plaintiff's Global Assessment Functioning ("GAF") score. Pl.'s Br. at pp. 13-17.

First, the Court notes that at Steps Two and Three of the sequential disability evaluation, in assessing whether a claimant's mental impairments are severe and if they meet or equal an impairment in the Listing, the ALJ utilizes a special psychiatric technique set forth in the Regulations. 20 C.F.R. §§ 404.1520(d), 404.1520a, 404.1525, & 404.1526. Through this special technique, the ALJ is required to consider all relevant evidence and "obtain a longitudinal picture of [a claimant's] overall degree of functional limitations." 20 C.F.R. § 404.1520a(c)(1). But, unlike the special psychiatric technique used at Steps Two and Three, the RFC assessment "is a multidimensional description of the **work-related abilities** [a claimant] retain[s] in spite of [his or her] medical impairments." 20 C.F.R. § Part. 404, Subpt. P, App. 1, § 12.00(A) (emphasis added). The assessments made within the

psychiatric review technique are **not** RFC assessments, but rather, are simply used to determine the severity of a claimant's mental impairments; in contrast, the RFC assessment "requires a more detailed assessment." Social Security Ruling (SSR) 96-8p, *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity In Initial Claims*, 1996 WL 374184, at *4 (S.S.A. 1996). In this regard, the RFC evaluation "includes consideration of the ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, co-workers, and customary work pressures in a work setting." Social Security Ruling (SSR) 85-16, *Program Policy Statement: Titles II and XVI: Residual Functional Capacity For Mental Impairments*, 1985 WL 56855, at *1 (S.S.A. 1985). In light of the broad category of functioning considered at Steps Two and Three, versus the more concentrated analysis required when assessing RFC, there is no *per se* error committed when the ALJ makes a finding a Step Two that does not equate to a finding in the RFC. *See Wells v. Colvin*, 87 F. Supp. 3d 421, 436 (W.D.N.Y. 2015) (citing *Golden v. Colvin*, 2013 WL 5278743, at *3 (N.D.N.Y. Sept. 18, 2013), for the proposition that "a finding at steps two or three does not automatically translate to an identical finding at step four"); *see also Ladue v. Astrue*, 2013 WL 421508, at *3 (N.D.N.Y. Feb. 1, 2013) (citing SSR 96-8p for the proposition that "the ALJ cannot simply rely on the limitations articulated in the severity analysis at steps two and three"). In other words, the ALJ's finding at Steps Two and Three that Fisher had moderate restrictions is not *per se* inconsistent with the RFC assessment.

Second, the Court agrees with Defendant that in giving substantial weight to Dr.

Harding's opinion and some weight to Dr. Caldwell's opinion, the ALJ was not bound to accept each and every conclusion stated therein, so long as substantial evidence supports the ALJ's RFC assessment. Def.'s Br. at pp. 11-12. In his April 2012 evaluation of Plaintiff, Dr. Harding reviewed the record and based upon his review of the record, he opined that Fisher's limitations did not "preclude her from working." *Id.* This conclusion is supported by substantial evidence.

As noted by Dr. Harding, pursuant to the consultive medical examiner, Fisher had some "limitations regarding [her] ability to complete tasks, make appropriate decisions, relate with others and handle stress[;]" but Fisher was also described as "cooperative with adequate manner of relating." *Id.* at p. 690. In her evaluation of Fisher, Nurse Bellefeuille noted that Fisher's ability to make simple work-related decisions, carry out very short and simple instructions, accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers was unlimited or very good, and that even though her ability to deal with normal work stress was seriously limited, it was not precluded. *Id.* at pp. 706-07. Nurse Practioner Bellefeuille specifically indicated that Fisher was capable of working low stress jobs. *Id.* at p. 704.

Moreover, the record shows that during the time she was allegedly disabled, until December 2011, when she dropped out of college for reasons unrelated to stress, Fisher was enrolled in a two-year program in Business Administration at Onondaga Community College, during which time she obtained part-time employment working with veterans on her campus and joined extra-curricular groups. *Id.* at pp. 197, 253, 422, 428, 452, 459, 473, 479, 489,

492-93, 541-50, & 561-62. In 2011, she was even inducted as President of the Student Association. *Id*. at p. 449. The medical record during the period of her alleged disability indicates that despite difficulties dealing with stress, Fisher was able to adequately cope with stressors. *See id.* at pp. 445, 451-52, 457, 473, & 548-50. Additionally, Plaintiff has been in a relationship with her partner for fifteen years, and has been married multiple times. *Id*. at pp. 72 & 178. At the time of the hearing, Fisher was helping to manage properties her partner owns and rents by taking calls regarding these properties. *Id*. at pp. 71-72. In applying for benefits, Fisher indicated she could cook and prepare her own meals, do light chores, pay her own bills and handle a savings account, and that at least every two to three weeks, she engaged in social activities with friends. *Id*. at pp. 217-18, 220, 248-49, & 255. Similarly, Plaintiff informed Dr. Lorenson during the consultive examination that she cooked three-to-four days a week, cleaned once a week, and showered and dressed herself most days. *Id*. at p. 662. Thus, there is substantial evidence to support the ALJ's mental RFC, notwithstanding his failure to adopt each and every finding rendered by Drs. Harding and Caldwell. *See Melia v. Colvin*, 2015 WL 4041742, at *13 (MAD/TWD) (N.D.N.Y. July 1, 2015) (citing 20 C.F.R. § 404.1546(c) for the proposition that "it is the ALJ's responsibility to determine a claimant's RFC and to not simply agree with a medical source's opinion").

Third, Plaintiff's contention regarding the ALJ's consideration of the VA disability determination is without merit. In 2012, the VA determined that Plaintiff had a service-connected disability of 80%. Tr. at p. 191. Under the Regulations, a determination by another agency that a claimant is disabled is not binding on the Commissioner, but it must

be considered.  20 CFR § 404.1504; Social Security Ruling No. 06-03p, *Titles II and XVI: II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" In Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, 2006 WL 2329939, at *6-7 (S.S.A. 2006).  Here, the ALJ explained that he considered the determination but found that it was not binding.  Tr. at p. 36.  Given that he considered it, I find that the ALJ did not err in his handing of the VA determination when determining the Plaintiff's RFC.

Finally, Plaintiff alleges that the ALJ improperly considered Plaintiff's GAF scores.[5] Pl.'s Br. at pp. 16-17.  The Court finds that Plaintiff has mischaracterized the way in which the ALJ utilized the Plaintiff's GAF score.  The ALJ made two references to the GAF score - once when relaying Plaintiff's mental health history, and the other when assessing whether diagnostic and clinical findings supported Plaintiff's subjective symptoms.  Tr. at pp. 32 & 33.  It appears that the ALJ did not use the GAF score in assessing Plaintiff's RFC, and even if he did, he did not solely rely upon the GAF score in rendering the RFC and, as outlined above, substantial evidence supports the ALJ's RFC determination.  *See Hoke v. Colvin*, 2015 WL 3901807, at *16-18 (N.D.N.Y. June 25, 2015).

### b. The ALJ's Credibility Determination

Plaintiff contends that the ALJ did not properly evaluate her credibility in accordance

---

[5] The GAF, or Global Assessment of Functioning, is a scale promulgated by the American Psychiatric Association to assist "in tracking the clinical progress of individuals [with psychological problems] in global terms."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR").  The scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health.  The GAF is no longer included in the most recent edition of the DSM.

with the relevant legal standards. Pl.'s Br. at p. 20. Where, such as here, "an underlying medically determinable physical or mental impairment[]. . . that could reasonably be expected to produce the individual's pain or other symptoms" is found, the ALJ must then "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Social Security Ruling No. 96-7p, *Policy Interpretation Ruling Titles II And XVI: Evaluation Of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements*, 1996 WL 374186, at *2 (S.S.A. 1996). "It is well settled that 'a claimant's subjective evidence of [symptoms] is entitled to great weight' where . . . it is supported by objective medical evidence." *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)). However, in a case where subjective symptoms are identified, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged." *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y 1987). Where the ALJ resolves to reject subjective testimony with regard to pain and other symptoms, he or she "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his [or her] determination is supported by substantial evidence." *Id.* at 608 (citing, *inter alia*, *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1045 (2d Cir. 1984)). In evaluating a claimant's subjective complaints of symptoms, an ALJ must consider several factors set forth in the Regulations including:

*-26-*

(i)     [The claimant's] daily activities;

(ii)    The location, duration, frequency, and intensity of [claimant's] pain or other
        symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication [claimant]
        take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms;

(v)     Treatment, other than medication, [claimant] receive[s] or ha[s] received for
        relief of [his or her] pain or other symptoms;

(vi)    Any measures [claimant] use[s] or ha[s] used to relieve [his or her] pain
        or other symptoms (e.g., lying flat on [his or her] back, standing for 15
        to 20 minutes every hour, sleeping on a board, etc.); and

(vii)   Other factors concerning [claimant's] functional limitations and
        restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, but that her statements regarding the intensity, persistence, and limiting effects of such symptoms were only partially credible. Tr. at p. 32. In this regard, he noted that there were only "minimal positive diagnostic and clinical findings" to corroborate the location, duration, frequency, and intensity of [Plaintiff's] pain and other symptom as a result of her impairments. *Id*. at p. 33. Indeed, the Court finds that, as noted above, imaging and other tests revealed normal findings or only mild-to-moderate abnormalities with her spine. The ALJ also noted that during the consultive examination with Dr. Lorenson, despite lumbar spine limitation of motion and a positive straight leg raise on the right, Fisher could "sit without any difficulty; she had full range of motion in her cervical spine; her joints were stable and nontender; her thoracic spine exam was normal; she had 5/5 strength in her upper and lower extremities; her reflexes were

normal; and no muscle atrophy was evident." *Id.* The ALJ also noted, correctly, that Fisher had not sought medical treatment for her physical condition since August 2012, nor has she sought mental health treatment since November 2012. *Id.* And, her GAF scores have consistency been in the fifties, which indicates moderate limitations in her mental functioning.[6] *Id.* Finally, he noted that despite the fact that Plaintiff suffers from PTSD, Plaintiff was able to work at substantial gainful levels for many years after the events leading to such diagnosis. *Id.*

After reviewing the record, I find that the ALJ did not err when he determined Plaintiff's subjective complaints were only partially credible. Furthermore, having found that the ALJ did not commit any errors in weighing the opinion evidence and Plaintiff's credibility, I find that in assessing Plaintiff's RFC, the ALJ employed the correct legal standards and his findings are supported by substantial evidence.

### 3. The ALJ's Failure to Consult a VE

At Step Five of the sequential disability evaluation, the Commissioner bears the burden of proving that despite the claimant's severe impairments, she is capable of performing work that is available in the national economy. 20 C.F.R. § 404.1520(f).

---

[6] A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR"). A GAF of 41 to 50 means that an individual has serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* A GAF of between 51 and 60 indicates moderate symptoms (*i.e.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*i.e.*, few friends, conflicts with peers or co-workers). *Id.* A GAF between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning but generally functioning pretty well and has some meaningful interpersonal relationships. *Id.*

Ordinarily, if a claimant suffers solely from exertional impairments, the Commissioner meets her burden at the fifth step by resorting to the applicable Medical-Vocational Guidelines ("the Grids"). *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); 20 C.F.R. §§ 404.1569 & 404.1569a. The Grids place claimants with severe exertional impairments who can no longer perform past relevant work into categories according to their RFC, age, education, and work experience (*i.e.*, skilled or unskilled as well as transferability of skills). 20 C.F.R. Pt. 404, Subpt. P, App. 2; *see also Clark v. Barnhart*, 2003 WL 221397777, at *4-5 (E.D.N.Y. Sept. 16, 2003). Based on these factors, the Grids are dispositive on whether the claimant is disabled or not disabled and proper application thereto will obviate the need for any vocational testing. *Rosa v. Callahan*, 163 F.3d at 82 ("For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled."). Exclusive use of the Grids, however, is "inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations," *i.e.*, a combination of exertional and non-exertional limitations.[7] 20 C.F.R. § 404.1569a(d). "[W]hen significant nonexertional impairments are present or when exertional impairments do not fit squarely within grid categores, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity." *Horbock v. Barnhart*, 210 F. Supp. 2d 125, 127 (D. Conn.

---

[7] Exertional limitations are strength limitations, which include the ability to sit, stand, walk, carry, push, and pull. 20 C.F.R. § 404.1569a(a)-(b); *see also Zorilla v. Chater*, 915 F.Supp. 662, 667 n.3 (S.D.N.Y. 1996) (citing 20 C.F.R. § 404.1569a(b)). Non-exertional limitations imposed by impairments affect one's ability to meet requirements of jobs, other than strength demands including, "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. § 404.1569a(c)(1)(vi); *see also Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y.1997) (citing 20 C.F.R. § 404.1569a(a) & (c)).

2002) (citing *Bapp v. Bowen,* 802 F.2d at 605). "A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations." *Charlebois v. Comm'r, Soc. Sec. Admin.*, 2003 WL 22161591, at *10 (N.D.N.Y. Sept. 12, 2003) (citing, *inter alia*, *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983)).

Here, the ALJ determined that Plaintiff retained the RFC to meet all of the physical exertional requirements for light work, and therefore a finding of "not disabled" would be directed by the Grids. Tr. at p. 37. However, the ALJ acknowledged that Plaintiff had non-exertional limitations due to her mental restrictions. *Id*. Nevertheless, the ALJ determined that despite Plaintiff's nonexertional impairments, she retained the ability to meet the mental demands of unskilled work, and therefore, her nonexertional mental limitations had little or no effect on the occupational base of unskilled light work, thus dictating a finding of "not disabled". *Id*.

The mental demands of unskilled work include

- [u]nderstanding, remembering, and carrying out simple instructions[;]
- [m]aking judgments that are commensurate with the functions of unskilled work – i.e., simple work-related decisions[;]
- [r]esponding appropriately to supervision, co-workers and usual work situations[; and]
- dealing with changes in a routine work setting.

Social Security Ruling No. 96-9p, *Policy Interpretation Ruling Titles II AND XVI: Determining Capability to Do Other Work--Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, 1996 WL 374185, at *9 (S.S.A. 1996); *see also* Social Security Ruling No. 85-15, *Program Policy Statement: Titles II AND XVI: Capability to Do Other Work-The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments,* 1985 WL 56857, at *4 (S.S.A. 1985).

-30-

In this case, Nurse Bellefeuille indicated that Plaintiff was limited in her ability to understand, remember and carry out very short and simple instructions, and make simple work-related decisions. Tr. at p. 706. She also found that while Fisher's ability to handle work related stress was seriously limited, it was not precluded and she indicated that Plaintiff could handle working a low stress job. *Id*. at pp. 706-07. She further noted that Fisher's ability to accept instructions and respond appropriately to criticism from a supervisor and to get along with co-workers and peers was unlimited or very good. *Id*. at p. 706. Finally, she noted that Plaintiff's ability to respond to changes in a routine work setting was limited but satisfactory. *Id*. at p. 707.

Dr. Harding indicated that while Fisher had "some limitations regarding [her] ability to compete tasks, make appropriate decisions, relate with others and handle stress[,]" Fisher's limitations were mild-to-moderate and did not by themselves, preclude her from working. *Id*. at p. 690. He also concluded that she was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions, nor was she significantly limited in her ability to get along with coworkers or peers, or to respond appropriately to changes in the work setting. *Id.* at pp. 688-89.

Moreover, as stated above, Fisher was able to attend school for over two years prior to withdrawing for reasons unrelated to stress, and her notes from counseling and psychiatric visits in 2011 indicate that despite experiencing difficulty dealing with stress, she adequately coped with it. *See id*. at pp. 445, 451-52, 457, 473, & 548-50. Numerous counseling and psychiatric visit records from 2010 and 2011 also indicate that she was pleasant and

cooperative at sessions. *Id*. at pp. 437, 448, 450, 453, 455, 458, 469, 472, 478-79, 483, 486, 492, & 496. Fisher stated that she could cook, clean make her own meals, drive, take public transportation, assist her partner of fifteen years with managing his rental properties, shop online, and care for her grandson. *Id*. at pp. 69, 71-72, 446, 662, & 665.

"[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp v. Bowen*, 802 F.2d at 603. Rather, only when a claimant's nonexertional limitations "significantly limit the range of work permitted by his exertional limitations" such significant diminishment renders sole reliance on the grids is inappropriate. *Id*. at 605-06. "A claimant's work capacity is 'significantly diminished' if there is an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Id*. at 606 (quoted in *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).[8]

Given the above, I find that the ALJ's determination that Fisher's mental nonexertional limitations do not significantly erode her ability to do unskilled work is supported by substantial evidence, thus there was no error committed when the ALJ failed to invoke the services of a VE.

---

[8] The Second Circuit arrived at this standard in reliance on sister circuit case law as well as the report accompanying the promulgation of the grids. *See Bapp v. Bowen*, 802 F.2d at 605-06. The promulgation report made clear that nonexertional limitations may have the effect of excluding certain jobs within a particular category, however, in some cases, such exclusions are negligible in that a wide range of jobs exist within the functional level especially in light of the fact that an individual "need not be able to perform each and every job in a given range of work." *Id*. at 606 (quoting 43 FED. REG. 55,349-55,361).

### III.  CONCLUSION

In light of the foregoing discussion, the Court finds that in denying Fisher Social Security benefits, the ALJ employed the correct legal standards and his decision is supported by substantial evidence.  Therefore, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying DIB benefits be **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F. 2d 85, 89 (2d Cir. 1983) (quoting *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636 (b)(1); FED. R. CIV. P. 72 & 6(a).


Date:  March 11, 2016
      Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge